IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA and BILLINGS DIVISIONS



FILED

OCT 1 8 2016

Clerk, U.S. District Court
District Of Montana
Billings

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff/Respondent,<br><br>vs.<br><br>BRIAN E. BARKER,<br><br>        Defendant/Movant. | Cause No. CR 03-29-M-SPW |
| UNITED STATES OF AMERICA,<br><br>        Plaintiff/Respondent,<br><br>vs.<br><br>BRIAN EDWARD BARKER,<br><br>        Defendant/Movant. | Cause No. CR 04-82-BLG-SPW |

## **ORDER**

These two cases come before the Court on a combined motion by Defendant

Barker seeking to vacate, set aside, or correct the sentences under 28 U.S.C. §

2255. Barker is a federal prisoner proceeding pro se.

Barker was prosecuted in two successive federal cases, one in the Missoula

Division and one in the Billings Division. On direct review, he attempted to argue

the Missoula prosecution precluded the Billings prosecution, but he was

1

unsuccessful. Now, on collateral review, he alleges that he was unsuccessful because counsel was ineffective, or the prosecution committed misconduct, or both.

In reality, however, Barker was unsuccessful because the federal law of drug conspiracy and substantive offenses supports significantly harsher consequences for people who engage in high-volume drug trafficking with numerous distributors. *See Witte v. United States*, 515 U.S. 389 (1995); *United States v. Felix*, 503 U.S. 378, 380-81 (1992). Barker's trial counsel, Robert Stephens, did not correctly explain to him what constitutes a conspiracy. His performance was deficient. But 28 U.S.C. § 2255 does not support relief when there is no reasonable probability that competent counsel would have obtained a better result.

With the exception of one of Barker's claims, which is granted and remedied by entry of an amended judgment, all claims for relief lack merit. In addition, the motion in the Missoula case is untimely.

## I. Background[1]

After serving a state sentence for drug trafficking, Barker was released from Montana State Prison in November 2002. At the end of December 2002, he was arrested in Great Falls with marijuana, methamphetamine, and cash on his person

---

[1] For the sake of efficiency, some language in this section of the Order has been borrowed from orders issued in Barker's previous proceeding under 28 U.S.C. § 2255. But the undersigned first conducted an independent review of both cases, including their factual and procedural backgrounds.

and another 167 grams of methamphetamine in his vehicle. From at least that point on, he was under investigation by a joint state-federal task force in Missoula and a joint state-federal task force in Billings.

## A. First Indictment and Arrest

On May 7, 2003, a grand jury returned an indictment against Barker and Raymond Tetzlaff, his nephew, in the Missoula Division of this Court. The grand jury charged Barker, Tetzlaff, "and others" with conspiring, between December 2002 and March 2003 in Missoula, Great Falls, and Billings, to distribute a substance containing at least 50 grams of methamphetamine, a violation of 21 U.S.C. §§ 846 and 841(a) (Count 1). Barker alone was charged with possessing, in Great Falls on December 27, 2002, at least 50 grams of methamphetamine with intent to distribute it, a violation of 21 U.S.C. § 841(a)(1) (Count 2). In Count 3, Tetzlaff was charged with possessing, in Missoula, at least 50 grams of methamphetamine with intent to distribute. The United States pled a *Pinkerton* theory[2] that exposed Barker to liability on that count as well. Indictment (03-29 Doc. 1) at 2-3, *United States v. Barker*, No. CR 03-29-M-DWM ("the Missoula case") (D. Mont. filed May 7, 2003). Based on the type and quantity of drug alleged in the Indictment, conviction on any of Counts 1, 2, or 3 would subject

---

[2] *See Pinkerton v. United States*, 326 U.S. 640, 647 (1946) ("If [the overt act element in a conspiracy charge] can be supplied by the act of one conspirator, we fail to see why the same or other acts in furtherance of the conspiracy are likewise not attributable to the others for the purpose of holding them responsible for the substantive offense.").

Barker to a five-year mandatory minimum sentence and a forty-year maximum sentence. 21 U.S.C. § 841(b)(1)(B)(viii).

Based on the Indictment, a warrant was issued on May 8, 2003, for Barker's arrest. *See* Docket Entry (May 8, 2003).While the Missoula warrant was outstanding and Barker was at large, an agent in Billings received information from one Tasha Carter that her drug source, Sheila Pich, was expecting delivery of a package of methamphetamine in the mail. A postal inspector intercepted a package addressed to "Sister Sheila" at Pich's residence, and a controlled delivery was made. Inside the package was a pound of methamphetamine. Pich agreed to cooperate with the ongoing investigation. She said the package was from Barker and that her aunt was planning to take a bus from Billings to Butte to give Barker his money. Billings officers alerted Missoula officers, whose warrant was outstanding, that they expected Barker to be in Butte on July 23, 2003.[3]

On that day, the bus, officers from Billings, and officers from Missoula all went to Butte, but Pich's aunt did not. When the bus arrived, officers spotted Amanda Brothers there to meet it. When Pich's aunt did not emerge from the bus, Brothers went instead to a nearby motel. A man in a pickup truck met her, talked with her, and then drove away. The officers followed the truck, believing the driver to be Barker. They asked a uniformed officer in a marked car to stop the

---

[3] The Warrant Return gives the date as July 21, 2003, but it was not executed by the arresting officer. The officers who made the arrest testified it occurred on July 23, 2003.

4

truck. At the scene of the stop, the driver was confirmed to be Barker. He was arrested on the Missoula warrant. Officers seized two duffel bags from the vehicle. One contained methamphetamine, heroin, pills, and marijuana, and the other contained a significant amount of cash. *See* Tr. Suppression Hr'g (04-82 Doc. 77) at 4:25-19:12, 57:8-22.

## B. The Missoula Case

The next day, July 24, 2003, Barker was arraigned on the Missoula indictment. Minutes (03-29 Doc. 23). Barker retained attorney Robert L. Stephens, who appeared on his behalf on August 19, 2003. Substitution of Counsel (Doc. 34). On October 21, 2003, the United States filed an Information alleging that Barker had previously been convicted of two felony drug offenses. Filing of the Information elevated the mandatory minimum sentence from five years to ten and the maximum sentence to life. Information § 851 (Doc. 81); 21 U.S.C. §§ 841(b)(1)(B), 851(a)(1).[4]

Barker eventually agreed to plead guilty to Count 2. In exchange, the United States agreed to dismiss Counts 1 and 3 and to "bring no further action against the Defendant based upon the facts alleged in this indictment or the acts or occurrences giving rise to this indictment." Plea Agreement (03-29 Doc. 82) at 2 ¶ 4, 8 ¶ 12; *see also id.* at 9-10 ¶ 17. Barker's guilty plea was accepted on October 27, 2003.

---

[4] Only one prior conviction is required under 21 U.S.C. § 841(b)(1)(B), but the Information alleged two.

Minutes (Doc. 83).

A presentence report was prepared. Barker's drugs were converted to their equivalent quantities in marijuana, *see* U.S.S.G. § 2D1.1 Application Note 10, for a total of 1,018.4 kilograms of marijuana. Barker was ultimately held responsible for a slightly lower amount, 700 to 1,000 kilograms of marijuana, corresponding (at that time) to a base offense level of 30. *Id.* § 2D1.1(c)(5). He received a three-level downward adjustment for acceptance of responsibility, *id.* § 3E1.1, for a total adjusted offense level of 27. Presentence Report ¶¶ 36-47. His criminal history category was VI. *Id.* ¶ 75. His guideline range was 130 to 162 months, U.S.S.G. ch. 5 Part A (Sentencing Table).

Barker testified at sentencing on February 13, 2004. On direct, he asserted that all the drugs found in Amanda Brothers' motel room on the day of their arrest belonged to him and that his activity in Butte was "the same activity that arises out of the indictment" and was "directly related to what [he was] charged with here" in Missoula. He also stated that he was "accepting responsibility for those drug quantities." Sentencing Tr. (03-29 Doc. 117) at 31:8-32:7. On cross-examination, Barker testified, "My involvement in Billings had nothing to do with Thomas [Tetzlaff]." *Id.* at 41:1-9.

Barker was sentenced to serve 162 months in prison, to be followed by a five-year term of supervised release. Judgment (03-29 Doc. 108) at 2-3. He did

6

not appeal. His conviction in the Missoula case became final on March 2, 2004, when his time to appeal expired. *See Gonzalez v. Thaler*, __ U.S. __, 132 S. Ct. 641, 653-54 (2012); *Griffith v. Kentucky*, 479 U.S. 314, 321 n.6 (1987).

### C. Indictment, Trial, and Sentencing in the Billings Case

On May 24, 2004, a grand jury indicted Barker in a second case, this one venued in the Billings Division. Amanda Brothers was named as a co-conspirator. Indictment (04-82 Doc. 1) at 2. Another warrant was issued. Barker was arrested at a federal prison in Victorville, California, and arraigned in this Court on December 9, 2004. He again retained Rob Stephens to represent him. Minutes (Doc. 12).

The Billings indictment charged a larger quantity of methamphetamine—at least 500 grams of a substance containing methamphetamine. In addition, on July 8, 2005, the United States filed an Information alleging the same two prior state felony drug convictions that were alleged in the Missoula case. Information § 851 (04-82 Doc. 61). Due to the drug quantity alleged, filing of the Information elevated the mandatory minimum sentence from ten years to twenty years, if one prior conviction was valid. If both prior convictions were valid, Barker faced a mandatory term of life in prison. *See* 21 U.S.C. §§ 841(b)(1)(A), 851(a)(1).

On November 21, 2005, the United States obtained a superseding indictment. It alleged that Barker conspired with Brothers, Pich, "and others" to

7

distribute and to possess with intent to distribute at least 500 grams of a substance containing methamphetamine (Count 1); distributed at least 500 grams of a substance containing methamphetamine (Count 2); and possessed with intent to distribute at least 500 grams of a substance containing methamphetamine (Count 3). Although Counts 2 and 3 did not refer to conspiracy or allege any facts or elements of a conspiracy charge, each count cited 21 U.S.C. § 846 as well as § 841(a)(1), as Count 1 did. Each offense was alleged to have occurred in Billings from January 2003 through July 23, 2003. Superseding Indictment (04-82 Doc. 114) at 2; *see also* [Second] Information § 851 (Doc. 159) at 1-2; Supp. Information § 851 (Doc. 159-1) at 1-2.

The parties agreed to a bench trial, which commenced on March 21, 2006. Pich, Tetzlaff, Barker, and three law enforcement officers testified. Barker's trial strategy was to show that the crimes alleged in the Billings prosecution were the same as the crimes alleged in the Missoula case. Barker testified, as the last witness, about his understanding of the Missoula plea agreement. Judge Cebull acquitted Barker on Count 1, the conspiracy count, because the evidence did not show that Barker's frequent but random transactions with Sheila Pich constituted a conspiracy. Judge Cebull found Barker guilty on Counts 2 and 3. Bench Trial Tr. (04-82 Doc. 211) at 212:10-214:3.

On July 21, 2006, based on his two prior state felony drug convictions,

8

Barker was sentenced to a mandatory term of life in prison on both counts, concurrent with each other and with his sentence in the Missoula case. A five-year term of supervised release was also imposed. Minutes (04-82 Doc. 195); Judgment (Doc. 198) at 2-3.

### D. Appeal, Remand, and Second Appeal in Billings Case

Barker appealed. He argued that the Billings prosecution was barred by double jeopardy and by the terms of the Missoula plea agreement. He also made a procedural challenge to the § 851 Information.

The Court of Appeals held that "Barker was not subject to multiple prosecutions for the 'same offense.'" Mem. at 2, *United States v. Barker*, No. 06-30443 (9th Cir. July 17, 2007) (04-82 Doc. 216) (unpublished mem. disp.) (citing *United States v. Saccoccia*, 18 F.3d 795, 798 (9th Cir. 1994)). It also held he was not subjected to "multiple punishment." *Id.* (citing *Witte v. United States*, 515 U.S. 389, 403-04 (1995)). The court declined to address the § 851 claim and remanded the case for an evidentiary hearing "to determine what the parties reasonably understood to be the terms of the plea agreement." *Id.* at 4 & n.1.

On remand, new counsel was appointed to represent Barker so that trial counsel Rob Stephens could testify as a witness. After a hearing at which AUSA Van de Wetering, Stephens, and Barker, among others, testified, Judge Cebull found "no factual basis for claiming that the package mailed to Sheila Pich was an

9

act or occurrence that gave rise to the Missoula Indictment" and concluded that "the terms of the Missoula plea agreement did not bar the government from prosecuting Defendant on Count II or III of the Superceding Billings Indictment." Order (04-82 Doc. 248) at 18-19.

Barker again appealed, challenging Judge Cebull's interpretation of the plea agreement and the validity of the § 851 Information. He also asserted that the United States violated his right to due process by failing to disclose, in the course of plea negotiations in the Missoula case, that it intended to prosecute him for additional drug crimes.

The appellate court rejected Barker's arguments. It held the United States' pledge in the Missoula plea agreement that it would "bring no further action against the Defendant based upon the facts alleged in this indictment or the acts or occurrences giving rise to this indictment," Missoula Plea Agreement (03-29 Doc. 82) at 8 ¶ 12, could not "reasonably be interpreted to include a transaction that occurred well after the Missoula indictment" was handed down, Mem. (04-82 Doc. 256) at 2, *United States v. Barker*, No. 09-30339 (9th Cir. Dec. 17, 2010) (unpublished mem. disp.). The court also noted that "[t]he only ongoing 'act or occurrence' that might have linked the Missoula and Billings indictments was the conspiracy charged in the Missoula indictment, but Barker successfully argued in the Billings trial that he did not conspire with Pich and was acquitted on that

10

charge." And the court pointed to the testimony showing that "before the plea agreement was signed the government refused to commit to Barker's counsel that no further indictments were being contemplated." The appellate court concluded, "Barker's interpretation of the plea agreement was not objectively reasonable." *Id.* at 3; *see also* Evid. Hr'g Tr. (04-82 Doc. 231) at 69:5-70:8.

The appellate court deemed the § 851 procedural and notice issues waived by trial counsel's failure to object in the trial court. Mem. at 4-5, *Barker*, No. 09-30339. It also deemed the duty-to-disclose issue waived by Stephens' failure to object in the trial court and failure to raise the issue in the first appeal. *Id.* at 3-4. Further, it stated that "Barker already knew of the possibility of further charges" when he entered into the Missoula plea agreement "and unreasonably assumed that the plea agreement disclaimed indictment for future acts." *Id.* at 4.

Barker's conviction in the Billings case became final ninety days later, on March 17, 2011. 28 U.S.C. § 2255(f)(1).

### E. Section 2255 Motion in Billings Case

On March 8, 2012, Barker filed a motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255. Although he discussed the Missoula case at length, he did not challenge the validity of his conviction or sentence in that case. *See* Mot. § 2255 (04-82 Doc. 261), *passim*; Br. in Supp. (Doc. 267), *passim*. On the contrary, he maintained Stephens' general argument that the guilty plea and

sentence in the Missoula case should have resolved all issues related to Barker's liability for drug crimes. Thus, the judgment in the Billings case was the sole target of his § 2255 motion.

Among other claims, Barker alleged that Stephens was ineffective in several respects in the Billings case. Eventually, the evidence showed that, before the Billings indictment came down, Stephens had persuaded a state prosecutor to stipulate to vacating one of the two prior felony drug convictions underlying the United States' § 851 Information. Stephens failed to file the stipulated dismissal in the state trial court, failed to tell the federal prosecutor the conviction had been vacated, and failed to mention to the federal court that he was even pursuing vacation of that conviction, much less that he had actually obtained it. He objected to a life sentence on several grounds, all unfounded. But he never said one of the two convictions underlying Barker's mandatory life sentence had been vacated before the federal mandatory life sentence was imposed. On March 5, 2013, Judge Cebull granted Barker's § 2255 motion because counsel's performance was egregiously ineffective with respect to the sentence. The judgment imposing life in prison was vacated. Order (04-82 Doc. 278) at 4-5.

Except for one claim that could have been addressed at re-sentencing, all other claims in Barker's first § 2255 motion were denied for lack of merit. A certificate of appealability was also denied. *See* Order Denying Some Claims (04-

12

82 Doc. 272); Order (Doc. 278) at 2-4.

## F. Re-Sentencing and Appeal in the Billings Case

After Judge Cebull retired, on June 6, 2013, Judge Haddon re-sentenced Barker to serve 262 months in prison. Judge Haddon ordered that the sentence be consecutive to the sentence in the Missoula case. He also imposed a five-year term of supervised release, concurrent with the Missoula case. *See* Am. Judgment (04-82 Doc. 292) at 2-3.

Barker appealed. On July 28, 2014, the Court of Appeals affirmed the new sentence. Mem. (04-82 Doc. 305) at 6, *United States v. Barker*, No. 13-30164 (9th Cir. July 28, 2014) (unpublished mem. disp.). In Barker's parallel appeal of the denial of the other claims in his § 2255 motion, the appellate court denied a certificate of appealability "without prejudice to the filing of a new 28 U.S.C. § 2255 motion," Mem. (Doc. 307) at 1, *United States v. Barker*, No. 13-35334 (9th Cir. Oct. 27, 2014).

Barker's conviction in the Billings case became final, once again, on December 1, 2014, when the United States Supreme Court denied his petition for writ of *certiorari*. Clerk Letter (04-82 Doc. 309) at 1, *Barker v. United States*, No. 14-6887 (U.S. Dec. 1, 2014).

## G. Motions to Reduce Sentence

On July 31, 2015, under 18 U.S.C. § 3582(c)(2) and Amendments 782 and

13

788 to the federal sentencing guidelines, Barker's sentence in the Missoula case was reduced to time served as of November 1, 2015. Am. Judgment (03-29 Doc. 136) at 1.

On August 6, 2015, his sentence in the Billings case was reduced to 240 months, the applicable mandatory minimum sentence, consecutive to the sentence in the Missoula case. Am. Judgment (04-82 Doc. 320) at 1.

## G. Current § 2255 Motions

On November 30, 2015, *see* Mot. § 2255 (04-82 Doc. 323 & 03-29 Doc. 139) at 9; *Houston v. Lack*, 487 U.S. 266, 270-71 (1988) (prison mailbox rule), Barker submitted one § 2255 motion to the Court. Because the motion and accompanying brief alleged the invalidity of the judgments in both the Missoula case and the Billings case, the motion and brief were filed in both cases.

## II. Preliminary Review

In each case, the § 2255 motion is subject to preliminary review to determine whether "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also* Rule 4(b), Rules Governing Section 2255 Proceedings for the United States District Courts.

A petitioner "who is able to state facts showing a real possibility of constitutional error should survive Rule 4 review." *Calderon v. United States Dist.*

*Court,* 98 F.3d 1102, 1109 (9th Cir. 1996) (Schroeder, C.J., concurring) (referring to Rules Governing § 2254 Cases). "[I]t is the duty of the court to screen out frivolous applications and eliminate the burden that would be placed on the respondent by ordering an unnecessary answer." Advisory Committee Note (1976), Rule 4, Rules Governing § 2254 Cases, *cited in* Advisory Committee Note (1976), Rule 4, Rules Governing § 2255 Proceedings.

## III. Analysis

### A. Timeliness of the Motion in the Missoula Case

On March 10, 2016, the Court advised Barker that the motion in the Missoula case appeared to be untimely. Barker was given an opportunity to show cause why it should not be dismissed with prejudice. He argues that the limitations period should not commence until "a reasonable time after April 11, 2011." Resp. to Order (03-29 Doc. 146) at 3. In a declaration, he suggests November 2011. Barker Decl. (Doc. 146-1) at 2 ¶ 7. Barker also asserts that the motion in the Missoula case is "inextricably intertwined" with the Billings case and that Judge Cebull did not decide all claims raised in the first § 2255 motion. Resp. to Order at 6-10.

The Missoula and Billings cases are intertwined, but that does not make the Missoula motion timely. 28 U.S.C. § 2255(f) governs the timeliness of claims in a § 2255 motion:

15

(f) A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of—

(1)     the date on which the judgment of conviction becomes final;

(2)     the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3)     the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4)     the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Barker's conviction in the Missoula case became final on March 2, 2004, more than eight years before he filed a § 2255 motion in the Billings case and eleven and a half years before he filed a § 2255 motion in the Missoula case.

Barker claims that he could not, even with due diligence, have discovered that his counsel's advice was ineffective until the appellate court found, in the second direct appeal in the Billings case, that counsel's understanding of the Missoula plea agreement was "not objectively reasonable." Mem. (04-82 Doc. 256) at 3, *United States v. Barker*, No. 09-30339 (9th Cir. Dec. 17, 2010) (unpublished mem. disp.). He also asserts that he did not receive the Ninth Circuit's decision in a timely fashion.

Based on Barker's declaration, the Court will assume he received notice of

16

the appellate court's decision in November 2011. The Court will also assume, for the sake of argument, that Barker could not have pled a claim for ineffective assistance of counsel in the Missoula case until he was prejudiced by the outcome of the Billings case. That would mean his limitations period began running not when the Missoula conviction became final on March 2, 2004, but, at the latest, on November 30, 2011.

Even so, the time period Barker must account for is not just the time from November 30, 2011, until the filing of a § 2255 motion in the Billings case but the time from November 30, 2011, to November 30, 2015, when Barker filed his *first* § 2255 motion challenging his conviction in the *Missoula* case.

Barker's first § 2255 motion in the Billings case was not filed in the Missoula case, did not claim to challenge the judgment in the Missoula case, *see, e.g.*, Mot. § 2255 (04-82 Doc. 261) at 2 ¶¶ 1-8, and did not actually do so. Barker alleged that counsel gave him bad advice in both cases, but he did not seek to undo the plea agreement in the Missoula case.

As the following chart shows, in Claims E, F, and H of his first § 2255 motion, Barker alleged the advice counsel gave in the Missoula case prejudiced him in the Billings case. In Claim G, he sought to enforce what he believed the Missoula plea agreement meant. The first and the current motion share Claims B, C, and D, but they are aimed only at the Billings case. Claims I, J, and K in the

17

first motion similarly concerned only the Billings case. Claim A is the only claim challenging the validity of Barker's conviction or sentence in Missoula. Claims A, M, and N were not raised in the first § 2255 motion:

| | First Motion | Current Motion |
|---|---|---|
| A | | Trial counsel unreasonably advised Barker the Missoula plea agreement would preclude any subsequent federal drug trafficking charges, and Barker would have gone to trial had he understood the agreement would not resolve all potential charges. (04-82 Doc. 324 at 9). |
| B | Prosecution had a duty to disclose its intent to pursue charges in Billings; trial and appellate counsel unreasonably failed to assert breach of that duty. (04-82 Doc. 261 at 6 ¶ 2, 11 ¶ 1, 11 ¶ 11, 12 ¶ 2(a), 13 ¶ 1[2], 14 ¶¶ 2-3.)[5] | Prosecution had a duty to disclose its intent to pursue charges in Billings; trial and appellate counsel unreasonably failed to assert breach of that duty. (Doc. 324 at 21, 28-32). |
| C | Counts 2 and 3 alleged conspiracy and were duplicative of Count 1 and failed to confer subject-matter jurisdiction on the trial court; trial and appellate counsel failed to pursue these defenses. (Doc. 261 at 6-7 ¶¶ 3-4, 9 ¶ 7[1], 9-10 ¶ 8, 13 ¶¶ 1[2]-2[1]; id. at 9 ¶ 7[2], 13 ¶ 3[1]; Doc. 271 at 7-8). | Counts 2 and 3 alleged conspiracy, indicating the grand jury doubted Barker's direct liability and did not find an overt act; absence of conspiracy should have meant acquittal on all counts; trial and appellate counsel failed to pursue these defenses. (Doc. 324 at 22-27). |
| D | Distribution of methamphetamine is a lesser included offense of possession of methamphetamine with intent to distribute. (Doc. 271 at 7-8). | Distribution of methamphetamine is a lesser included offense of possession of methamphetamine with intent to distribute; trial and appellate counsel unreasonably failed to say so. (Doc. 324 at 27-28). |
| E | Barker incurred prejudice in the Billings case from counsel's advice to testify at sentencing in the Missoula case. (Doc. 261 at 7-8 ¶ 5, 10 ¶ 9, 12 ¶ 2(b)). | |
| F | Prosecution withheld Pich's pound of methamphetamine from the Missoula sentence to enhance Barker's sentence in Billings to life in prison. (Doc. 261 at 13- | |

_____

[5] In Doc. 261, there are two paragraphs numbered 1, 2, and 3 on page 13 and two paragraphs numbered 7 on page 9. The number in brackets clarifies which paragraph 1, 2, etc., is intended.

|   |   |   |
|---|---|---|
|   | 14 ¶¶ 3-4). |   |
| G | Both the Missoula and Billings indictments alleged one single, ongoing conspiracy. (Doc. 261 at 8-9 ¶ 6). |   |
| H | Trial counsel and prosecution colluded to use the Missoula conviction to enhance Barker's sentence in the Billings case. (Doc. 261 at 7-8 ¶ 5, 10 ¶ 9, 10 ¶¶ 9-10, 12 ¶ 2(b), 13 ¶ 2[2]). |   |
| I | Prosecution acted vindictively by alleging same predicate convictions in the § 851 Informations filed in both Missoula and Billings. (Doc. 261 at 12 ¶ 1, 14 ¶ 3). |   |
| J | Appellate counsel was ineffective for failing to follow up on a resolution proposed by the prosecution on remand. (Doc. 267 at 20-21 ¶ 2[2]; Doc. 267-1 at 19.) |   |
| K | Trial counsel was ineffective for failing to follow up on state court's dismissal of one conviction underlying the § 851 Information. (Doc. 261 at 11 ¶ 11). |   |
| L | Conviction and/or sentence is invalidated by cumulative error. (Doc. 261 at 14). |   |
| M |   | Trial counsel was ineffective because he failed to move to change venue to Missoula. (Doc. 324 at 20). |
| N |   | The Billings indictment constituted prosecutorial judge-shopping. (Doc. 324 at 33-46). |

The motion Barker filed on November 30, 2015, is the first one challenging the validity of his conviction or sentence in the Missoula case. Even if the limitations period commenced as late as November 30, 2011, it expired on November 30, 2012, three years before Barker filed the current § 2255 motion. The motion is untimely.

Barker points to *Martinez v. Ryan*, __ U.S. __, 132 S. Ct. 1309, 1320 (2012),

which held that ineffective assistance or lack of representation in postconviction proceedings may constitute cause to excuse procedural default. But *Martinez* does not authorize tolling the statute of limitations. *See, e.g., Arthur v. Thomas*, 739 F.3d 611, 628-31 (11th Cir. 2014). To whatever extent Barker's unique situation may blur the lines between procedural default and the statute of limitations, the Court addresses the claim's lack of merit below.

Barker also contends that Judge Cebull did not address all the claims he made in his first § 2255 motion. Resp. to Order (03-29 Doc. 146) at 6-10. Assuming this argument is relevant, it is not accurate. Judge Cebull did not decide Barker's claim that he could not be sentenced in the Billings case on both Count 2 and Count 3, because that claim could have been addressed at the re-sentencing hearing. But he decided each other claim. *See* Order Denying Some Claims (04-82 Doc. 272) at 20 ¶ 2; Order Granting § 2255 Mot. and Denying Certificate of Appealability (04-82 Doc. 278) at 1-5. Barker is correct that the limitations period was not mentioned when he filed his first § 2255 motion, but there was no need to mention it. The motion was timely in the Billings case.

Barker's § 2255 motion in the Missoula case is dismissed with prejudice as untimely.

## B. Merit of the Motion in the Missoula Case

In addition to being time-barred, Barker's § 2255 motion as to the Missoula

20

case lacks merit. Barker alleges that, had counsel competently advised him that the plea agreement in the Missoula case would not preclude a subsequent prosecution, he would not have pled guilty but would have gone to trial. Br. in Supp. (03-29 Doc. 140) at 13-21.

Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). At this stage of the proceedings, Barker must allege facts sufficient to support an inference (1) that counsel's performance fell below an objective standard of reasonableness, *id.* at 687-88, and (2) that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. "[T]here is no reason . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

### 1. Counsel's Performance

Trial counsel Stephens told Barker that he should plead guilty to the distribution offense alleged in Count 2 of the Missoula indictment. Stephens said the government, in exchange, would dismiss the other counts and would promise not to prosecute Barker for any other "acts or occurrences giving rise to this [Missoula] indictment." Plea Agreement (03-29 Doc. 82) at 8 ¶ 12. Stephens also told Barker that all of his drug trafficking activities were "one big conspiracy"; that this big conspiracy encompassed all the acts and occurrences giving rise to the

Missoula indictment; that conspiracy, by its nature, is an ongoing offense; and that any substantive offenses committed in furtherance of Barker's "one big conspiracy" would also be "acts or occurrences giving rise to" the Missoula indictment, even if those substantive offenses were committed after the Missoula indictment was handed down. *See* Br. in Supp. (03-29 Doc. 140) at 13-14; *see also* Evid. Hr'g Tr. (04-82 Doc. 231) at 68:9-69:2, 70:12-24, 72:7-12, 75:8-14, 79:8-25, 86:6-20, 89:25-92:17, 94:2-95:3; Bench Trial Tr. (04-82 Doc. 211) at 203:14-23 (Barker explains his understanding of what was dismissed by the Missoula plea agreement), 205:13-21 (Stephens echoes Barker's understanding).

In sum, Stephens told Barker that accepting the Missoula plea agreement would bar the United States from prosecuting Barker for *any other drug trafficking offenses*, whenever they occurred, because all of Barker's trafficking was "one big conspiracy" beginning on the day he was released from prison and concluding with his arrest in Butte in July 2003.[6]

This advice was wrong. An individual is not the foundation of a conspiracy. A conspiracy is defined by the nature and scope of an agreement between two or more individuals. "[P]roof that a defendant sold drugs to other individuals does not prove the existence of a conspiracy" because it does not "prove that at least two

---

[6] Stephens testified that he believed the terms of the plea agreement would protect Barker. He also testified that he asked three prosecutors whether they intended to pursue additional charges. It is not clear why he asked prosecutors about their intentions if he was convinced the language of the plea agreement would protect Barker, but that is what he said.

persons had an agreement to commit the underlying offense." *United States v. Lennick*, 18 F.3d 814, 819 (9th Cir. 1994).

To show "one big conspiracy," Stephens had to have evidence that others were involved not just with Barker but in some way with each other.[7] Tetzlaff and Pich, for example, might have had an express agreement with each other or, failing that, they might at least have had some reason to know others were involved with Barker and to believe the success of Barker's involvement with those others would benefit them. *See, e.g.*, 9th Cir. Crim. Jury Instr. 8.16-8.18 (2003).

But when Stephens was explaining his advice to Barker and why he gave it, he failed to identify evidence linking Tetzlaff or Clelland with Pich or Brothers in a conspiracy. He stated that Pich posted Barker's and Tetzlaff's bail in Missoula, *see* Evid. Hr'g Tr. (04-82 Doc. 231) at 70:13-24, but he did not say Pich knew what she was doing or had reason to know Tetzlaff's release would redound to her benefit. (Tetzlaff later testified that his bail money came from Barker, who got it from Pich. Bench Trial Tr. (04-82 Doc. 211) at 181:1-25. Pich remembered paying a drug debt to Barker but not bail money. *Id.* at 68:10-69:2.). Pich's bail

---

[7] Showing that Tetzlaff had an agreement with Barker and that Pich also had an agreement with Barker, for instance, would show two smaller conspiracies, not one big one, unless some evidence supported at least a tenuous connection between Tetzlaff and Pich. In any event, the evidence did not support a conspiracy between Barker and Pich. Barker simply called Pich whenever he had methamphetamine to sell, fronted it to her, and then collected the proceeds. Amid the last of their transactions, Barker took steps to facilitate Pich's ability to communicate with him. But even then, Pich did not agree to use the phone he offered, because she opened the package in the presence of the DEA. *See* Bench Trial Tr. (Doc. 211) at 41:7-53:9, 64:21-66:5, 78:12-81:15, 86:6-89:10; *Lennick*, 18 F.3d at 819.

23

money was the only link Stephens suggested might exist between Pich and Tetzlaff, and it did not forge the kind of link required to constitute a conspiracy. Barker himself agreed that *he* was the only factor Tetzlaff and Clelland had in common with Brothers or Pich. *See* Bench Trial Tr. at 210:4-210:22. He alone could not make his own entire course of dealing into "one big conspiracy." Stephens also defended Barker against the conspiracy charge alleged in Count 1 of the Billings case by showing that Pich did not conspire with Barker. *See* Bench Trial Tr. (04-82 Doc. 211) at 65:12-67:5, 68:10-69:2, 70:14-71:16, 79:5-81:15, 83:7-84:2, 86:20-88:9, 155:15-156:12; *id.* at 136:21-138:10, 164:18-165:8, 170:19-171:16, 175:17-177:6, 212:10-14.

Stephens' evident misunderstanding of the meaning of a conspiracy led him to tell Barker the Missoula plea agreement would protect Barker when it would not. His performance was deficient.

### 2. Prejudice

But, under the circumstances, what difference did counsel's bad advice make? It is not enough for Barker to assert that he would have gone to trial if counsel had correctly advised him.[8] The prejudice inquiry is objective. He must allege facts sufficient to support an inference that a reasonable, competently

---

[8] Barker does not allege that Stephens' advice caused him to reject a better offer or accept a worse offer. *See, e.g., Missouri v. Frye*, __ U.S. __, 132 S. Ct. 1399, 1409 (2012); *Lafler v. Cooper*, __ U.S. __, 132 S. Ct. 1376, 1385 (2012).

24

advised person in his position could have made a reasonable choice to go to trial instead of pleading guilty. *See Hill v. Lockhart*, 474 U.S. 52, 59-60 (1985).

By accepting the Missoula plea agreement, Barker lost nothing he could otherwise have gained, and he gained something he would not otherwise have had. He does not suggest he had a viable defense to the Missoula indictment, so there is no reason to think he would have been acquitted of any charge at trial. And, if convicted following trial, he would not have received a three-level reduction in his offense level, *see* U.S.S.G. § 3E1.1, for acceptance of responsibility. Regardless of the terms of the Missoula plea agreement, Barker had the same incentive to plead guilty as any reasonable defendant who is highly likely to be convicted. With his guilty plea, his then-mandatory guidelines sentencing range fell from 168 to 210 months down to 130 to 162 months.

In addition to forfeiting the three-level reduction, rejecting the plea offer and forcing the government to prepare for trial might have invited closer scrutiny of Barker's activities. The government could have insisted on adding the Pich pound at sentencing as relevant conduct, increasing the mandatory guideline range to 210 to 262 months. Even if it had done that, it *still* could have obtained a new indictment in Billings after Barker had been sentenced in Missoula to a term between 168 and 210 months, or even 210 to 262 months. *See Witte v. United States*, 515 U.S. 389, 392-95, 403-04 (1995). Or the government might have

superseded the Missoula indictment before trial and subjected Barker to a mandatory life sentence based on the drug quantity and Barker's two prior felony drug convictions—exactly what Barker was trying to avoid by pleading guilty. *See* Evid. Hr'g Tr. (04-82 Doc. 231) at 101:13-102:3. The law permitted any of these alternatives. There is no reasonable probability Barker would have gone to trial if he knew the terms of the Missoula plea agreement would not preclude any further drug prosecution in federal court. There is no reasonable probability Barker could have obtained a better outcome by rejecting the Missoula plea agreement.

Barker also seems to suggest counsel was ineffective at sentencing in the Missoula case because he did not argue that all of Barker's drug trafficking in Montana was "one big conspiracy." Br. in Supp. (03-29 Doc. 140) at 16 (quoting Order (04-82 Doc. 248) at 18). First, it was not one big conspiracy, so counsel's failure to make the argument was not ineffective assistance. *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005); *Baumann v. United States*, 692 F.2d 565, 572 (9th Cir. 1982). Second, even if had counsel served up extra methamphetamine to boost the base offense level in the Missoula case, that *still* would not have foreclosed a subsequent prosecution for other substantive offenses in Billings, as *Witte* squarely held. *See also United States v. Faulkner*, 793 F.3d 752, 756-57 (7th Cir. 2015) (affirming continuing vitality of *Witte*). Again, Barker was not prejudiced by counsel's performance in the Missoula case.

Finally, nothing about the Missoula case was used against Barker in the Billings case. No fact admitted by Barker's plea and no statement made by him in the plea colloquy in Missoula was used in Billings. Barker testified at length at sentencing in Missoula, *see* Sentencing Tr. (03-29 Doc. 117) at 18:2-41:13, but his testimony was not used in the Billings case. The Missoula conviction was not and could not be relied on as a predicate conviction under 21 U.S.C. § 851.[9] The Missoula conviction did not even affect Barker's criminal history category in the Billings case. He was in category VI with or without the Missoula conviction.[10]

Barker's § 2255 motion in the Missoula case is meritless. Although counsel's advice about the meaning of the Missoula plea agreement was wrong, there is no reasonable probability Barker would have decided to go to trial or would have obtained a better outcome had he been competently advised of its meaning. In addition to being time-barred, the § 2255 motion with respect to the

---

[9] The mandatory life sentence applies only if a defendant "commits" the offense "*after* two or more prior convictions for a felony drug offense have become *final*." 21 U.S.C. § 841(b)(1)(A) (emphases added). Barker committed the substantive offenses prosecuted in the Billings case in July 2003, several months before the Missoula conviction became final on March 2, 2004. *Griffith v. Kentucky*, 479 U.S. 314, 321 n.6 (1987); Fed. R. App. P. 4(b)(1)(A)(i).

[10] At his re-sentencing in 2013, Barker received three points for the Missoula conviction, bringing the total number of criminal history points to 14. Presentence Report (04-82 Doc. 294) ¶ 66. It appears, therefore, that the Missoula conviction moved Barker from 11 points and criminal history category V to 14 points and category VI. But appearances are deceiving. Barker was already in category VI when he was sentenced in Missoula in 2004. The 2013 presentence report mistakenly omitted two criminal history points that should have been assessed because Barker committed the Billings offense less than two years after he was released from state prison. *See* Presentence Report (03-29 Doc. 198-2) ¶ 67; U.S.S.G. § 4A1.1(d). Adding those two points, Barker had 13 points without the Missoula conviction, putting him in criminal history category VI.

Missoula conviction, *see* Br. in Supp. (03-29 Doc. 140) at 13-21, lacks merit.

## C. The Billings Case

One or more of the following claims might be procedurally defaulted. It is more efficient, however, to address the merits.

### 1. Prosecution's Duty to Disclose

Barker alleges that the United States had a duty to disclose, in the course of the Missoula plea negotiations, its intent to pursue charges in Billings. In view of the appellate court's determination, on direct review, that Barker forfeited the argument, he also contends that trial and appellate counsel unreasonably failed to assert the United States breached that duty before the Billings trial occurred and on the first phase of direct review. *See* Br. in Supp. (04-82 Doc. 324) at 21, 28-32; *see also* Mem. (Doc. 256) at 3-4, *Barker*, No. 09-30339.

The government generally is not required to bring in one prosecution all charges available to it. In plea negotiations, a prosecutor must disclose additional charges that are being contemplated only if failure to do so would violate due process. In turn, due process is violated by "foul play" or by violation of "fundamental fairness." *See United States v. Clark*, 218 F.3d 1092, 1097 (9th Cir. 2000); *United States v. Krasn*, 614 F.2d 1229, 1234 (9th Cir. 1980). "Whether a defendant has been denied fundamental fairness from a failure to disclose is determined by the facts of each case." *Clark*, 218 F.3d at 1097 (citing *Krasn*, 614

28

F.2d at 1234).

*Clark* and *Krasn* addressed charges pressed in two separate prosecutions following investigations that were "somewhat intertwined." *Clark*, 218 F.3d at 1094. In *Clark*, the defendant faced charges of robbing post offices in Oregon, Nevada, and Idaho. His defense counsel was not aware of a second investigation into a pawn shop burglary and theft of firearms in Salmon, Idaho. Had counsel been aware of it, "he would have negotiated further" in the first case "to reach agreement" resolving the pawn-shop burglary as well. *Id.* The AUSA prosecuting the first case originally "did not know about the Salmon burglary investigation when he negotiated the plea agreement," but he found out about it before executing the agreement. He "did not understand [the Salmon burglary] to be included in the plea agreement" resolving the postal-robbery charges. *Id.* The plea agreement in the first case foreclosed additional charges "in connection with this investigation," but there was "very little evidence of a link between investigations of the two different crimes." *Id.*; *see also id.* at 1096-97. In view of those facts, the court held that the prosecution was not required to disclose the investigation of the Salmon burglary. The court said "the Salmon burglary and the postal robberies involved independent criminal transactions" and the Salmon investigation "was ongoing, could mean a large sentence, involved an informant and could raise safety concerns if disclosed." *Id.* at 1097.

In *Krasn*, the defendant was charged with providing gratuities to government meat inspectors. Krasn's counsel, Katz, engaged in plea negotiations with AUSA Bonner. Bonner was also involved in the initial stages of an antitrust investigation of Krasn's activities. Plea negotiations on the gratuities charges proceeded as follows:

> Katz said that he wanted the matter concluded so that there would not be any further criminal proceedings against Krasn based on his past activities. When Bonner asked what he meant, Katz said that the only things which he could think of were violations of the Internal Revenue laws. . . . Bonner agreed to dismiss the remaining counts of the indictment, and forego prosecution on charges arising from the giving of bribes or gratuities, if Krasn pled guilty to four of the gratuities counts. Katz . . . agree[d] . . . provided that it was understood that the government would not prosecute Krasn under the Internal Revenue laws for the giving of bribes or gratuities. . . . Bonner replied that the charges included criminal violations of the Internal Revenue laws.

*Krasn*, 614 F.2d at 1232-33. Thus, "[a]t the time of the plea agreement Bonner knew about the pending antitrust investigation but he did not disclose this to Katz." *Id.*

When Krasn was subsequently indicted for antitrust violations, he sought dismissal, arguing that the prosecutor's failure to say Krasn was also being investigated for antitrust violations breached the duty of good faith. For two reasons, the court found no due process violation. First, although the gratuities case and the antitrust case concerned the same defendants and arose from "the same industry-wide investigation of the meat-packing industry," the charges

"involved independent criminal transactions." *Id.* at 1234. Second, the antitrust investigation "was, at most, only at a preliminary stage" and was not "ready to submit to the grand jury during the plea negotiations on the gratuities charges." *Id.*

In Barker's case, the Billings investigation may have been ready to present to the grand jury at the time the Missoula plea agreement was under discussion (though there is no indication any prosecutor intended at that time to seek an indictment). But even if AUSA Laws planned to indict Barker, defense counsel's position in this matter was entirely different than in *Krasn* or *Clark*. There, counsels' ignorance of other investigations prevented them from negotiating a global resolution. In Barker's case, only one thing prevented defense counsel from seeking a global resolution in the Missoula plea negotiations: his hope that keeping mum would minimize the drug amount to be attributed to Barker at sentencing.[11]

Stephens knew his client's drug trafficking activities were considerably broader than the conspiracy alleged in the Missoula indictment. *See, e.g.*, Evid. Hr'g Tr. (04-82 Doc. 231) at 62:5-12. Stephens knew the government knew it, too. The prosecutor in the Missoula case "handed over everything" in discovery, and

---

[11] After the evidentiary hearing held on January 24, 2008, Judge Cebull concluded that the mandate on remand from the appellate court did not permit him to rule on the duty to disclose. At the hearing, however, the parties understood they were developing a record on the duty to disclose as well as the meaning of the terms of the plea agreement. *See* Evid. Hr'g Tr. at 5:11-23, 7:1-10:18, 34:12-36:11, 57:1-14.

that discovery included information relevant to Barker's arrest in Butte. *Id.* at 27:7-24, 37:2-13, 44:12-45:6 (AUSA Van de Wetering), 60:20-61:9, 68:7-69:18, 71:6-11, 76:16-77:20 (Stephens); *see also id.* at 36:20-25; Presentence Report (03-29-M) ¶¶ 24, 27-28, 31. In a letter to Barker, Stephens specifically noted that the proposed plea agreement in the Missoula case provided a narrower non-prosecution pledge than other plea agreements in his experience. *See* Plea Agreement (03-29 Doc. 82) at 8 ¶ 12; Evid. Hr'g Tr. (04-82 Doc. 231) at 74:21-75:5, 77:22-81:8, 86:3-20, 87:4-88:14, 89:6-89:18.

Faced with a narrowed non-prosecution clause, and knowing the Missoula discovery contained at least the seeds (if not the fruits) of additional charges that could be filed against Barker, Stephens testified that he was concerned to "make sure that when we entered into that plea agreement" in Missoula, "it was a global plea agreement." But he did not "make sure" by telling AUSA Thaggard, who was negotiating the plea agreement with Stephens, that Barker wanted a global agreement. Stephens simply asked Thaggard and two other prosecutors whether they intended to pursue other charges. According to Stephens, AUSA Seykora, who prosecuted most drug cases in the Billings Division, was "ambivalent" about the prospect of additional charges. AUSA Van de Wetering, who opened and closed the Missoula case but was on leave during plea negotiations, did not "ever really appreciate[] the scope" of Barker's drug trafficking activity. And Thaggard

told Stephens "he had no control" over whether additional charges would be brought. Evid. Hr'g Tr. (04-82 Doc. 231) at 69:3-70:8. Despite these non-committal responses, "what [Stephens] took away from those conversations" was that "they weren't interested in pursuing any further charge." *Id.* at 75:15-23. That was "[his] opinion" and what he communicated to Barker. *Id.* at 96:15-16:3.

This evidence does not remotely support an inference that Thaggard or anyone else engaged in "foul play" in negotiating the Missoula plea agreement. No one misled Stephens. The prosecutors Stephens chose to talk to did not include AUSA Laws, who later obtained the Billings indictment.

If Stephens had told Thaggard he wanted to "wrap it all up," no doubt Thaggard would have said something like, "Well, what do you mean?" *Krasn*, 614 F.2d at 1232; Evid. Hr'g Tr. (04-82 Doc. 231) at 85:21-86:20. Stephens did not want to discuss questions like that, because he was trying to limit the drug quantity attributed to Barker at sentencing in Missoula. That would be much harder to do if he displayed interest in obtaining a guarantee that no further drug trafficking charges would be brought.

In sum, this case is not like *Krasn* and *Clark*. There, facts known to the prosecution were withheld from defense counsel and hindered counsel's full representation of his client. Even those facts did not trigger a duty to disclose. Here, not only was the writing on the wall, but Stephens read it and asked three

different prosecutors questions about it. The fact that he did not get what he expected from the Missoula plea agreement had nothing to do with the prosecutors' conduct. As explained above, nothing about the Missoula case prejudiced Barker in the Billings case. There was no foul play and no fundamental unfairness in the United States' negotiation of the plea agreement in the Missoula case.

Because there was no duty to disclose, Barker was not prejudiced by counsel's failure to claim a breach of that duty in the trial court or in the first phase of direct appeal. *Cf.* Mem. (04-82 Doc. 256) at 4 (finding "no manifest injustice in considering this issue waived because Barker already knew of the possibility of further charges, and unreasonably assumed that the plea agreement disclaimed indictment for future acts."). All claims predicated on a duty to disclose are denied.

## 2. Pleading of Counts 2 and 3 in the Indictment

Barker asserts that Counts 2 and 3 were conspiracy counts and were duplicative of and/or multiplicitous with Count 1. This allegation arises from the fact that Counts 2 and 3 of the superseding indictment alleged that the offenses occurred "in violation of 21 U.S.C. §§ 846 and 841(a)(1)." Superseding Indictment (04-82 Doc. 114) at 2.

The allegations of fact in those two counts plainly set forth substantive

offenses of distribution and possession with intent to distribute, not conspiracy. There was a mere citation error.[12] The transcript of the bench trial shows that Barker knew what he had to defend. Therefore, the citation error is not a basis for vacating Barker's convictions. Fed. R. Crim. P. 7(c)(2); *Russell v. United States*, 369 U.S. 749, 760-63 (1962). This claim is denied.

### 3. Multiplicity of Counts 2 and 3

Barker contends that Counts 2 and 3 of the Billings indictment were multiplicitous and that counsel was ineffective for failing to say so. *See* Br. in Supp. of Mot. § 2255 (Doc. 324) at 22-28. Although there was nothing wrong with charging both counts, trying Barker on both, or convicting him on both, it was not appropriate to sentence him for both. *See United States v. Palafox*, 764 F.2d 558, 562 (9th Cir. 1985) (en banc); *see also* Bench Trial Tr. (Doc. 211) at 17:16-18:4, 212:10-214:3. The United States concedes this point. See Resp. to Order to Show Cause (Doc. 332) at 2.

As to this claim, Barker's § 2255 motion will be granted, and an amended judgment will be entered.

### 4. Venue

Finally, Barker makes two claims related to venue in the Billings Division.

---

[12] There was another citation error as well. The caption of the Superseding Indictment stated the correct penalty range but cited 21 U.S.C. § 841(b)(1)(B) rather than § 841(b)(1)(A). As with the citation error of which Barker complains, no one was misled about which penalty range applied. The error has been corrected in the Amended Judgment. Fed. R. Crim. P. 36.

First, he contends that the prosecution engaged in judge-shopping by charging him in Billings, and second, he claims that trial counsel should have moved to change venue to Missoula so that Judge Molloy would preside.

The local rules of the District define the appropriate division of venue for trial. *See* D. Mont. L.R. 3.3(b), 3.1(b) (eff. Dec. 1, 2003). The United States alleged that Barker committed offenses in Billings and Butte. Therefore, venue was proper in either Billings or Butte. D. Mont. L.R. 3.1(a)(1), (2). Barker's conviction in the Missoula case had no bearing on where the Billings case should be tried. There is no reason to think the prosecution was judge-shopping when it filed an indictment in an appropriate division of venue. Counsel had no legal support for a motion to change venue. These claims are denied.

## IV. Certificate of Appealability

The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2255 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484

(2000)). Where a claim is dismissed on procedural grounds, the court must also decide whether "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Gonzalez v. Thaler*, __ U.S. __, 132 S. Ct. 641, 648 (2012) (quoting *Slack*, 529 U.S. at 484).

## A. Missoula Case

Given counsel's description of his advice to Barker at the evidentiary hearing on remand on direct review, it is clear that his performance was unreasonable. But Barker does not claim he had any prospect of defending against the Missoula charges. He had nothing to gain by going to trial. His position was not good, but that was because his criminal activities provided ample legal support for further prosecution and harsh sentences, not because of his guilty plea or the terms of his plea agreement. There is no reasonable probability that Barker would have gone to trial or would have obtained a better outcome if he had been correctly advised about the scope and meaning of the Missoula plea agreement. There is no reason to encourage further proceedings.

Further, there is no room to debate the timeliness of the motion in the Missoula case. Barker's first § 2255 motion was aimed only at the judgment in the Billings case, not the judgment in the Missoula case. In fact, at least some of Barker's claims for relief depended on the Missoula plea agreement remaining in place. Even assuming the limitations period did not begin to run until November

30, 2011, Barker did not file until four years later, three years too late.

## B. Billings Case

Barker's counsel knew there was significant law enforcement interest in Barker's activities. Rather than telling any federal prosecutor that he wanted to "wrap it all up," he chose to ask three prosecutors whether they intended to pursue additional charges against Barker. According to counsel's own testimony, all three gave him non-committal answers. These facts do not demonstrate that any prosecutor engaged in "foul play" or did anything fundamentally unfair by failing to disclose any intent a fourth prosecutor may have had to pursue an indictment in Billings. Neither trial nor appellate counsel were ineffective for failing to preserve the issue.

The Billings indictment contained citation errors in Counts 2 and 3, but the allegations of fact set forth substantive offenses.

The prosecution did not "judge-shop" by filing the Billings indictment in an appropriate division of venue. Counsel had no legal support for a motion to change venue.

None of these claims makes a showing with any substance to it that Barker was deprived of a constitutional right. Reasonable jurists would find no basis to encourage further proceedings.

Accordingly, IT IS HEREBY ORDERED as follows:

1. As to the motion in the Billings case (04-82 Doc. 323), Barker's claim that he could not be sentenced on both Count 2 and Count 3 is GRANTED. The clerk shall enter the amended criminal judgment provided with this Order.

2. All other claims in the Billings case are DENIED for lack of merit.

3. In the Billings case, a certificate of appealability is DENIED as to all claims. The clerk shall immediately process the appeal if Barker files a notice of appeal.

4. In the Billings case, the clerk will close the civil filed by entering judgment by separate document in favor of Barker and against the United States as to Barker's claim that he could not be sentenced on both Count 2 and Count 3 and in favor of the United States and against Barker on all other claims.

5. As to the motion in the Missoula case (03-29 Doc. 139), all claims are DISMISSED WITH PREJUDICE as time-barred and, in the alternative, all claims are DENIED for lack of merit.

6. In the Missoula case, a certificate of appealability is DENIED as to all issues. The clerk shall immediately process the appeal if Barker files a notice of appeal.

7. In the Missoula case, the clerk will close the civil file by entering

judgment by separate document in favor of the United States and against Barker.

DATED this _18th_ day of October, 2016.

_Susan P. Watters_
Susan P. Watters
United States District Court